May we hear now from the Parties and Travelers Indemnity v. Century Indemnity. May it please the Court, Mark Mosier on behalf of Northrop Grumman, to get insurance coverage for the NISDEC claim. Grumman needed to forward the claim to its insurers. The evidence shows that Grumman's broker mailed a copy of the claim to both Travelers and Century. Despite this evidence, the District Court granted summary judgment for the insurers and held that no jury could find that Grumman satisfied its obligation to provide notice of the NISDEC claim. That decision... How was it proper notice? The ray line is the lawsuit against the town of Oyster Bay. Why is this proper notice of the claims at issue here? The packet included the claims letter. I think the important point, and what we argue is error below, is that the Court applied the wrong legal standard. The law in New York is that substantial compliance is sufficient to provide notice. And I would call the Court's attention to this Court's decision in U.S. Underwriters v. City Club Hotel. Right, but there's a concern about whether you were obliged to give notice well before 1983 when you discovered the contamination in the 1970s. Yes, that's a separate issue as to notice of occurrence versus notice of claim. If you want to turn to notice of occurrence... I mean, if your notice of occurrence claim is untimely, your notice of claim doesn't even matter, right? No, not as to Travelers. Right, as to Travelers. Correct. And this is an important point. A notice of occurrence, the issue has to be analyzed separately for each insurer. Let me let you finish your answer to Judge Chappell. Okay, so I'll move back to the notice of the claim. In this Court's decision in U.S. Underwriters v. City Club Health, the policyholder received a letter threatening a personal injury lawsuit. This letter says, enclosed is additional information on the above caption for your file. And the caption above is this, the old Beth Page landfill lawsuit. This doesn't sound like, you know, here we are putting you on notice of a claim. It sounds like we're providing additional information about this pending lawsuit. That's correct. That's what the cover letter from the broker to the insurers said. The claim itself was in the packet. Page 2 of this packet is the cover letter from Grumman to its broker. And you'll see on that, this subject is the NYSDEC claim. And in the letter it says the state is asserting a claim. But to get back to, and the point I really want to drive home is the legal standard in this U.S. Underwriters decision. And it says the site in question is no longer in use. Yes, that is, you know, I believe what they were referring to is the sludge bed. But if you look to the claim letter itself, it's clear that the claim is not limited to the sludge bed. It's a claim for investigation and remediation at and around the entire site. This would be no different, we would submit, as if there was a lawsuit filed. And the law is clear that to determine the scope of the lawsuit, you look to the allegations in the complaint. That's the four corners rule. And so if a policyholder... Site 130003, is that the sludge bed site? No. There's our position a jury could find, and NYSDEC has repeatedly taken the position that that is the entire Bethpage facility. That's clear from the records of decision in this case. It's also clear the way this administrative proceeding has played out. When additional contamination was found at the neighboring park... Oh, at the time, was the site still being used, the entire facility? Yes. How can it refer to the site in question is no longer in use? I believe that was not correct. In our position, right, in our position, if I could... This is also another mistake from Grumman to its broker. That's correct. And if I can make no other point this morning, I really want to call the court's attention again to the U.S. Underwriters case, where there it was undisputed that, like here, the cover letter from the broker contained a mistake. The underlying claim was a threat of a suit against one policyholder. But the attachment, which includes a letter from the insurer to the broker, contains a similar mistake. Well, I would say it was a different mistake. A different mistake. Oh, I'm sorry. A different mistake, but... Again, but to drive what this court held, what this court held, and U.S. Underwriters, when the insurer receives the actual claim, it receives notice of the claim. And what the court said in response to the errors on the cover letter, that inconsistent information is information nonetheless. If the insurer had any confusion, they could have reached out to the policyholder to rectify the situation. We are not aware, if you look at the contract, what does the policy say we have to do? Forward the claim. We are not aware of any case, the insurers have not cited any case, in which an insurer received the actual claim, and was still held to, as a matter of law, did not receive notice of the claim. And this was not just... I'm asking about that with respect to travelers, because there isn't proof that travelers received it. And my concern in that respect is, am I right in understanding the record that you sent it to the wrong person, and that's separate and apart from whether the wrong address was provided? There... But it's not sent to the correct person of travelers, and there's no proof that it received it. So at least with respect to travelers, I don't know how you clear that hurdle of the insurer got whatever the documents you're saying show. That's a different question with respect to the other insurer, Century. But how do you deal with that with travelers? The argument, and the court didn't hold that we sent it to the wrong person. The holding was that there was no evidence on which a jury could find receipt. This was an address. We sent it to an address. It wasn't sent to the right person, was it? I mean, there was a particular person you were supposed to send it to, and that's not who you sent it to. No, there was no evidence in the record that we were supposed to send it to somebody else. The evidence, we were given the address in connection with a different claim, but we still had every reason to believe, and the broker had every reason to believe that in connection with that claim, Century would have given an accurate address. But there's two other points, even beyond that, and I think... Travelers. Travelers. Yeah, excuse me. The policy language... Did you provide an address in the policy itself? Not to provide. There was... No one is alleged, and I'm not aware of any specific instruction of where to send the notice, letter, and the policy itself. And what the policy language says is to forward the claim, and it's our position that that policy language should be interpreted as focusing on the act of sending the claim. There are other policies, and they're cited in some of the cases the insurers rely on, in which the notice says, see to it that we receive notice. That policy language should clearly focus on receipt. Our policy language... The question is in the policy where it says forward the claim. Does it say forward the claim to... Is there a... Particular person? No. Or a place? No, just to the company. I believe is what it says, to the company. As we consider your argument that this was notice, is it appropriate to consider the fact that Grumman continued to negotiate with the New York State Department of Environmental Control and reached a settlement without consulting travelers? I mean, that doesn't sound to me like the correspondence was intended to provide insurance notice. I mean, there's a couple points. First, with respect to the voluntary payments, I think that's the clearest arguments we have for waiver. There was a meeting in 1989 where travelers said, you can go ahead and handle this as you see fit, and we won't object to a settlement. We have letters in 2002 and 2003... That's the waiver question. Right. And you're now talking about notice. I mean, you hardly acted afterwards as if you were party seeking to have insurance coverage. That's because travelers took a consistent position that these were not suits that they defended, and that's why those statements were made in the 1989 meeting. It was not until this court's decision in Avondale later in 1989 that this court rejected travelers' position and held that they did owe a duty to defend. And under the New York Court of Appeals, Mr. Shador Rosen... No, no, but you're alluding to this 1989 meeting, and there's only one affidavit or declaration from Mr. Gibson that sheds light on that meeting in the record that I've seen. There are contemporaneous notes from Mr. Gibson and from travelers. And his notes. Well, he reads his notes and says, now I remember what happened in 1989. There were notes also from travelers before the meeting. During that meeting, or at least based on the declaration, I did not see that Mr. Gibson indicated or suggested that travelers was not going to defend or going to defend. They said, according to him, let us know what happens. No, what he testifies, and it's in his declaration, is that Grumman was told that they should handle the matter as they saw fit, not that they were going to receive a defense. And that was consistent with travelers' position at the time. The district court concluded that in any event, Grumman was precluded from claiming coverage for the facility based on the pollution exclusion. Help us out as to why you don't think we should simply agree with the district court's reasoning on that subject. Well, first, that only applies to some of the policies, and so you would still have to reach the notice issue, because there are a substantial number of policies that have no pollution. I understand that, but... Your time is up, and I want to make sure we understand your argument on this. A central portion of the district court's reasoning is that the relevant discharge is the discharge into whatever container is being used. And so, because Grumman was intentionally placing TCE into containers, that was intentional. Some of the discharges were directly into the ground, right? But the evidence was there, and this was not excluded and not challenged. It's disputed as to which discharges are... I understand the point as to discharging into a tank. But there were discharges of waste directly into the ground. There were these recharge basins. There were these sludge drying beds. So there, the waste was discharged into the ground. But the evidence there shows that the TCE and contaminants in those wastewater discharges were there, where there was trace amounts of TCE, that the substantial contamination that has led to the cleanup is from the sudden accidental tank tin, right? And this is an important distinction I want to draw. In the wastewater... What evidence is there that the leaking from the tank was sudden? That gets to the sua sponte exclusion of Dr. Langseth. Dr. Langseth testified and would have offered the opinion that it was sudden, that it could have been expected to be at a rate of 250 gallons per week. He did that based on... I didn't find that sound. And I'm not sure I see what the error was. It doesn't seem as if that would have been, you know, except in one instance where there was a puncturing that it could have supported a finding of sudden and accidental. It seemed from the other evidence of the corrosion of the container that it was occurring over time. Dr. Langseth testified that even if corrosion ultimately led to the leak, when the leak occurred, the initial outburst would have been sudden, right? So corrosion just might mean it takes a while before the metal wall reaches the breaking point. But the relevant question is, once the breaking point is reached, is it a slow... That is something quite different from a puncture that nobody expects to happen. And a container that, because it is being allowed to corrode slowly over time, is inevitably going to result in discharge. I don't think that necessarily makes the discharge unexpected. I think it's... Well, there's a disputed issue of fact of whether... Accidental. Well, there's a disputed issue of fact as to whether it corroded over time. The evidence shows that tank 10... Well, the question is whether the evidence could support a finding that if you don't That is unexpected, and the district court concluded that it couldn't be. But the evidence showed that tank 10 was installed in 1970, and that it leaked within a year or two afterwards. That's not a let it just sit there and don't anything and corrode. Also not a puncture that no one expects to happen, which is the one incident that we have. But even, you know, if I could point even as to that, the judge said that too was expected because she said accidents can be expected to happen. And if you're going to have 30,000 people using forklifts and drums, there's going to be accidents, and therefore you lose insurance coverage. But what this court said in the city of Johnstown, and I think applies equally here, that's the reason policyholders get insurance, because they have 30,000 employees. One of them may have an accident, and that's when you look to the insurer for coverage. If it's just the possibility that some unknown employee at some unknown time is going to then the whole purpose of having insurance would be it would be defeated. You would purchase millions of dollars on premiums to purchase hundreds of millions dollars of coverage, and then someone punctures a drum and you lose it because you knew that that was possible. We don't think the law supports that. If I could reserve my number. Good afternoon, your honors. Lynn Nooner of Simpson Thatcher and Bartlett, representing the travelers entities as appellees. Your honors, this case is about a manufacturer that intentionally disposed of various wastes onto the ground for decades and ended up thoroughly polluting their own property in the groundwater below. When Grumman's polluting activities caught up with them in the 1980s, they undertook the required remediation on their own. They committed to spend hundreds of millions of dollars for substantial cleanup activities without involving their insurers. During this process, Grumman did not tender the environmental claims at issue here to on its own. My concern is that your letters of 2002 and 2003 appear to waive timely notice and voluntary payment prohibition. Your honor, let me address that directly. The D. Cranston letters in 2002 and 2003 do not relate to the Bethpage facility NYSDEC expensive cleanup process. They very clearly relate to a different claim, which was the Bethpage water district claim. Is it the water district or is it claims, all claims pertaining to the facility? No, your honor. The only claim that had been tendered to travelers is the Bethpage water district claim. Now there has been a misrepresentation about that because the letter is said to be about the Bethpage facility. But in fact, the letter is about the Bethpage water district claim. And you can see, your honors, that this letter pertains solely to the claim asserted by the Bethpage water district, which hadn't The second letter, the 2003 letter. I mean, I agree with you on the October 21st, 2002 letter, their specific reference to the water district claim and a drinking well. The second letter in 2003 is more broadly worded. It just refers to the Grumman facility. Yes, your honor. The second page. Yes. But the second letter is simply a follow up to the 2002 letter again from D. Cranston because she had not received any response to the first one. And you will see that she has the same exact ray line and the same exact which refers to Bethpage facility. But the claims themselves is the Bethpage water district because the contamination was emanating from the facility back to the prior letter. Why in your view is this so clearly a typo when it says specifically waives the right to late notice? Your honor, because if you look at the context of that paragraph, you see that D. Cranston said in the sentence before, we clearly reserve all rights related to this matter. And then it is a typo where she says we wave. She means to say reserve. When she was deposed, she said, I can tell this is a dictation error. If you look at the preceding paragraph, she actually says respectfully when she what she means to write is respectively. You're bound by what you sent. I mean, you know, if whether it was a dictation error or what, it's waves rather than reserves. It's the exact opposite. And I would say no effort to correct this. Your honor, it does not amount to waiver legally because it is not the intentional relinquishment of a known right. As to the nice deck statement is specifically waves the right to assert late notice and violation of the provisions relating to voluntary assumption. The law generally holds parties to their signed representations. Your honor, I will accept what you are saying, but here's why it doesn't change the outcome because that waiver would apply solely to the Bethpage Water District claim and which is not a party here. Well, exactly. And your honor, the Bethpage Water District claim was actually stipulated away by Northrop Grumman as having no coverage for it. This is a situation where Northrop Grumman. Waiver of late notices to a claim that's not in this case. Anymore. That's exactly right, your honor. That's why legally the 2002-2003 letters have no effect. If I may, the notice letter that Judge Chin focused on absolutely does not constitute adequate notice to travelers. First, it was not received, but second, it is definitely not a request for coverage. As you noted, it was sent to the litigation claims handler on the Bethpage landfill site as an update to that federal litigation. I would commend you to look at the other correspondence that Grumman sent to travelers in the 1983-1990 time frame. I don't know the industry, but a proper notice claim would not be sent to a litigation claims handler? Would it be sent somewhere else? It could be. It needed to be sent to travelers. To answer Judge Lohier's question earlier, there was not a specific person, but each time when you look at Grumman's correspondence, it was sending claims to its account executive. What I was just going to refer you to is this correspondence from at A6023 through 6083, which has over and over and over multiple claims, seven different claims that Grumman tendered that travelers accepted a defense on from 1983 to 1990. Grumman knew how to reach travelers. Judge Radji said this doesn't sound like the conduct of someone who is seeking coverage because it wasn't. It was not. Grumman did not seek coverage, and it did not involve travelers for its on-site facility remediation. When you look at these other seven tenders, it relates to off-site claims, landfills in other states and in New York. What are we to make of Mr. Gibson's declaration in which, I guess it's five years later in 1989, according to him in the declaration, he says that he has a meeting with the travelers folks. During the meeting, it was clear to him that the travelers' representatives were familiar with the 1983 PRP letter. Why doesn't that at least raise a question of fact? Your Honor, the Gibson declaration does not raise a triable issue of fact because it was a self-serving affidavit proffered 30 years later that conflicted with the contemporaneous evidence at the time. Well, he says that it's consistent with his notes. That is where I caution the panel and their law clerks to look at the actual evidence because the 56.1 statements are not reliable. You have to look at the actual underlying evidence, which is not always part of the appendix. So you're asking us to put aside this declaration of Mr. Gibson as self-serving for purposes of summary judgment? Yes, Your Honor. Or assessing the summary judgment decision here? Which is what Judge... So if we disagree with you about that, then what's your next answer? Your Honor, my answer on the 1989 meeting is that it was three years too late. There was no written writing. There was actually no understanding on Traveler's part that any claim was being tendered with respect to the NISDEC proceeding at the Bethpage facility. Recall this NISDEC proceeding became a site-wide investigation in 1986. In 1987, Grumman already agreed in principle to the remedial investigation feasibility study, and in 1988, Grumman submitted that RIFS. So if you look at Fairchild, the Second Circuit has held where the insured has already entered into significant negotiations with NISDEC. Notice after that is just too late as a matter of law. With all respect, nothing that happened in 1989 can cure the late notice that already came down. What I take part of the effect of the declaration is, is that it strongly suggests that Traveler's was aware before 1989 of the PRP letter, the 83 PRP letter, and therefore was notified. Your Honor, Mr. Gibson is essentially speculating as to what he believed was in Traveler's head. Maybe that's your answer, pure speculation. It is pure speculation, and with respect to the notes from Diane Riley, Traveler's account representative who was at that meeting, she makes clear that there was not a NISDEC proceeding at the Bethpage facility. When you look at her October 1989 follow-up letter, the writing, she says, I'm writing about the Bethpage Water District claim. Now keep in mind they're an off-site water district. And she said, you advised that there was a NISDEC proceeding at the Bethpage Water District. She and Traveler's never understood that they were being tendered a claim by NISDEC at the time. It was never tendered in writing, ever. If it had been, Traveler's would have set up a claim file, a separate unit number, assigned a claims handler, as it had done in all of these other matters that are in the record, and that didn't happen here. No one was more surprised in 2012 when, out of the blue, Traveler's received a demand for $40 million in past remediation costs at the Bethpage facility and was threatened that there would be another $350 million. That's what precipitated this lawsuit. And that was brought on, in part, by Grumman, old Grumman, which never thought there was coverage here, merging with Northrop, which then, in the new management, decided to undertake a hunt for money among the old legacy policies from the historic insurers. Traveler's defended many claims for Grumman and paid defense costs and, in one instance, paid indemnity. This claim, the NISDEC claim, was never on our roster of claims because Grumman hadn't noticed us and hadn't been working with us. It never partnered with us. It never asked for consent to enter into the remedial investigation. It never asked for us to weigh in on the different options. And that's why the Voluntary Payments Clause is also violated. Simply put, when the insurer is not provided notice of the 1983 PRP letter, because we agree with you, Judge Radjic, there's no evidence that that was received. It wasn't. And then there is further— It's usually a presumption of receipt, though, and I understood them to be relying on that. The presumption of receipt legally only comes into place when it is sent to the correct address. Right. That's the difficulty here. So they can't rely on it. And there's no triable issue of fact that that letter was received. It wasn't. And Travelers wasn't frustrating or trying to avoid receipts. In the same month, we received another letter and accepted a defense and assigned the law firm of Cahill Gordon to be the defense counsel. And again, you see that repeatedly over this 1983 to 1990 period. Travelers is stepping up to the plate. It's acknowledging receipt. It's assigning defense counsel. It's partnering with Grumman. That didn't happen on the NISDUC proceeding because it wasn't tendered. And really, the critical point I would say to you is that 1986 is when the world changed for Grumman. Up to that point, it had four sludge beds on its site that it was no longer using, that it had fully remediated. Judge Lohier already pointed out the internal Grumman correspondent saying that that was an inactive site. That was being taken care of. 1986 is when the world changes for Grumman. NISDUC comes in and says, you need to undertake a site-wide investigation, 600 acres. And you can see the internal correspondent saying, this is bad news. This is the opening volley in what could be a long, expensive $10 to $20 million remediation. It's now more like $100 to $200 million remediation. We've kept you well past your time, but I do want you to address just briefly your client's position on why the Water District claims needed separate notice. Your Honor, the Water District claims needed separate notice because they are, in fact, new demands from ACWA, South Farmingdale, and Massapequa. This court's precedent in Fairchild defines a claim as a demand for relief. Those three water districts, absolutely, in 2000 and 2001, their meetings with Grumman were demanding that Grumman remediate. And it wasn't just an abstract, we think you should be a good partner and do a lot of cleanup in your own Bethpage facility. They were demanding on-site wellhead treatments on their geographical real estate. That's remediation at their home, not at Grumman's home. So the policy itself, to get to your point, requires forwarding any demand. That's why 1986 is a new demand for the water districts. You have three new demands, one by each. It's sort of- There's a distinction between a claim and a demand? A claim can be a demand, a summons, a process of suit. So a claim is the big category, and underneath it, you can have a demand or a lawsuit. I agree, the water districts never filed their own lawsuits. What they did was participate in this quasi-administrative proceeding to pursue their rights. Let's make no mistake, each of those water districts wanted Grumman to put up the money to put the treatment on their own wellheads. Over and beyond what the other participants in the proceedings were asking for. Absolutely, Your Honor. And here, you've got a litigation manufactured argument, because when Grumman filed its answer, it said it faced claims from Bethpage Water District, Aqua, Massapequa, South Farmingdale. When it filed its counterclaims, it also referred to claims at these four sites. So this is a bit of an effort to try and say, we need to get coverage all under one theory. It's the one claim theory. If we can create enough of an ambiguity around that 1983 letter, hopefully we stay alive for summary judgment and an expensive settlement discussion. And call everything part of that claim. And I'm asking you to look at each claimant separately and do the analysis, because that is what's required under our contracts. Thank you. Thank you. Thank you, Your Honors. Good morning, Your Honors, and may it please the court. My name is John Hacker, counsel for the Century Entities. As Judge Raji pointed out in her colloquy with Mr. Mosher at the beginning, Century does have a somewhat different argument. Most of the arguments advanced by travelers do apply to us, and we will happily accept the benefit of them. But there's a separate one. The CC'd. Well, there's the CC'd point on the 1983 notice. But even before getting to that, there is the notice of occurrence that didn't occur. Because, as the record shows without any contradiction, Grumman knew everything that it needed to know by the late 1970s to provide notice to Century that an occurrence had happened. And do not take it from me, don't take it from the judge below, who cataloged the full record. But the most important document, I think, that resolves, and I want to be clear about this. The notice of occurrence point, by their own argument, resolves the entire case as to Century. Because as my colleague was just pointing out, they've been trying to narrow the case down to everything turns on the 1983-84 notice of whatever that was notice of. That's this one occurrence. And if, as is true, they didn't provide, they owed us a duty to notice the occurrence that is supposedly summarized in that notice. Then they fail as to all of their claims with respect to Century. You do have a concern that's different from Traveler's in that Grumman contends that delayed notice would have been excused as to at least your excess policies. Because they held a reasonable belief that they would not reach the $100,000 attachment point before they gave notice. How do you respond to that? A number of responses. First of all, and I think most important and most simply, they never reached any of that belief. There's absolutely no evidence that in the 1970s, they made a determination, understood that they were contaminating the wells, as was undisputed according to their own January 1979 report. They knew they were contributing. Forget everything about Hooker. Grumman knew they were contributing to contamination of TCE in the groundwater. And at no point, there's not one- Were the amounts being discussed for remediation and other things well under the main policy limits? No, Your Honor. The policy limits for the excess policies were $100,000. No, no, I mean the main policies. They weren't, the amounts being discussed at that point wouldn't have triggered the excess policies. Yeah, I'm sorry. I meant the attachment points. We're talking about the same policies, but when the Bethesda Water District actually threatened to assert a claim. Bethesda, the Bethpage Water District threatened to assert a claim in 1977. They identified that claim as hundreds of thousands of dollars. The Garrity internal report that Grumman conducted said it would be hundreds of thousands of dollars to, at least that, to remediate what they had identified as a problem. So there was a perfectly clear understanding at Grumman that if they were held liable for the contamination, which they were aware of and acknowledged that they had caused, it was going to be hundreds of thousands of dollars, which would easily meet the attachment point of the policies. But to go back to the antecedent point, they never made that analysis. The Allianz case explicitly says there has to be a, quote, deliberate determination that the liability will not reach a given policy. Otherwise, the insured can't come back decades later and say, well, if we'd thought about it, we would have reached that. There's not one memo, there's no testimony, there's no notes that suggest at any point in the 70s that anybody at Grumman did an analysis and says, we don't need to provide notice. Remember, we're talking about an excuse. The standard is subjective. I had thought the precedent suggested that it was an objective standard. It's both, Your Honor, because what you have to have, it's an excuse for not providing notice. You get to the threshold point that there was this occurrence, you knew about it. Why didn't you provide notice? You don't get to say, well, a reasonable insured wouldn't have. What you say is, we decided that it was not going to reach. We had a good faith. Well, all the cases say, the phrase they use is- Terminative decision. You had to reach, because the question is, did they have a good faith, a reasonable good faith belief in non-liability? The cases that Grumman cites are talking about reasonableness without talking about the antecedent question of whether they ever reached it. Because normally, the insured will have reached it, and the only question being litigated is whether it was reasonable. But here, and the Alliance case, excuse me, makes clear that there does have to be that antecedent threshold determination that in fact, you don't need to give notice because you've done the assessment and because you've determined that the liability that is acknowledged here isn't going to reach those policies. It was never reached. Assume for a second it was. Sorry, go ahead. That's just your first argument. I mean, even with respect to the 1983 communicate, or the communication of the 1983 PRP letter. Do I understand you correctly that even though there's no question your client got the copy of that one- We're the only party that has, I mean, possessed it. That did not satisfy your contract's notice requirement because the communication did not make mention of the century policy. Have I understood that argument correctly? That's part of the argument. It didn't invoke the century policies and seek coverage under the century policies, which I think is important. But it also goes to the broader point that this wasn't an effort to obtain coverage from anybody. There was no request for coverage, but certainly not from centuries. What it was was what it said on its face, which was the provision of additional information concerning an existing file involving litigation at the old Bethpage landfill. There was no point at which it was an actual claim. I want to address the case that Mr. Moser seems to be placing all of his weight on on appeal, which is the US Underwriters case. Which involved, if you look at the facts of that case and the discussion of the case, it involves inconsistent information on the face of the cover letter that is otherwise unambiguously a claim. It is a notice of a claim, and in the cover letter, it's not clear from the cover letter who the defendant is, there are inconsistent references. And at that point, the court says, well, the insurer can go ahead and figure out who the actual defendant is and resolve those inconsistent references. There's no inconsistency in this package. The package is unambiguous. It just happens to be unambiguously wrong. It says, or it's not unambiguously wrong, it's clearly an unambiguously correct statement of what Grumman itself thought. Which was that this is more information about another already existing claim in the old Bethpage landfill. It was not providing additional information, excuse me, it was not providing notice of any kind of new claim concerning the facility. With respect to the century policies, in addition, remember there's a requirement that with respect to providing a notice of occurrence, so this is the first time they've noticed anything to us. They have to provide all reasonably obtainable information to Century. There's no information provided to Century. They have all this information. They have the Garrity Report. They have their own internal memoranda identifying themselves, the January 1979 memoranda, which you'll find at A4036, identifying Grumman as a source of TCE contamination, explaining to the regulators what Grumman is going to do to stop the inadvertent spills that have led to excessive TCE contamination in the water well. None of that is provided to Century. Therefore, it plainly doesn't satisfy the requirements both of noticing the occurrence that it happened in the 1970s and earlier, or providing proper notice of the claim. If there are no further questions, thank you very much. I have a question. Assuming we get to the point of your getting notice of Oyster Bay's claim in 2005. I know Grumman received an intent to sue letter in 2002, but the only cause of action stated in the 2002 letter was the RCRA, which provides for injunctive relief, which is not covered by the policies. So is the 2005 notice of claim as to Oyster Bay adequate? The 2005 claim, first of all, there's so many problems before we get to the 2005. I understand that, but I just want to make sure I understand your position should we get to that point. The 2005 claim comes three years too late because the 2002 claim is what the notice of the RCRA violation is under this court's Fairchild decision. As my colleague pointed out, what you have to provide notice of is notice of an exposure to liability within the coverage of the policy. Because the RCRA claim is only for injunctive relief and that is not covered by the policies. That's why I'm asking you the question. But the problem is that the fact that they articulated RCRA as one theory is still, you know from that articulation that they believe that Grumman has caused a problem. That under another articulated theory would be within the scope of the policies. That's an exposure to liability within the scope of the policies. The fact, the precise specification of the statute under which you intend to sue is not the correct focus. The question under Fairchild is, are you talking about a problem? Are you giving notice of a problem that represents an exposure to liability within the policies? And that's clearly what happened in 2002. The 2005 notice, there was another problem with it being too late after they got notice of it. That's a secondary. Right, and there's no explanation at all for why they would wait 47 days. None whatsoever. Thank you. Thank you very much. I don't know if we'll hear from you in rebuttal. Virtually every issue in this case turns on the reasonableness of the party's actions and beliefs and their intent behind taking those actions. Those are quintessential fact questions. You heard from travelers that you need to interpret some letters by drawing inferences based on other letters. You need to interpret letters based on what was in the mind of the person who drew that. That's just not what should be done on summary judgment. Doesn't the waiver letter, the first one, specifically refer to a $1.3 million water district claim involving a well? In a prior paragraph, it does. But the heading, the subject in the heading is by site. It's not by claim, it's by site. And then the separate paragraph that doesn't contain any limitation as to particular claims contains the waiver. But as your honor also pointed out, that issue is only in one of the two letters. It doesn't get you past the other letter. Is the waiver in that letter something you're urging us to view as something that can't be decided as a matter of law? Yeah, we are not objecting to the story that you heard and what was in the mind being presented to the jury. We did not move for summary judgment that waiver had been done as a matter of law. We said this is a fact question. A jury should be able to take them at their word. And it's especially, I think, the letters should be interpreted in light of the 1989 meeting. The 1989 meeting, the testimony is, they said handle this how you see fit. So to try to say that this was out of the blue or strange to have included that in the letter, that's entirely inconsistent with what we had been orally told. It makes entire sense to put that in there. The first statement is a broad boilerplate language. We just generally reserve every right. The next sentence is specifically. We specifically waive these two rights. And they're the same two rights that we had reason to think had already been waived orally. Travelers keeps asking to draw an inference as to their actions. They didn't provide a defense here. But draw an inference from the fact that seven other times- Why would travelers make a waiver like that in a letter like this? We are positioned to tell the juries because they already had. This was consistent with the position they'd already taken. And the reason they had, and this gets back to those seven other letters. The seven other times they provided a defense was in litigation. In 1983, travelers took the position. We defend lawsuits. We do not defend environmental proceedings. This court rejected that argument post our 1989 meeting in Avondale. That's why we- But again, we're in the realm of what inference should you draw from the other seven letters. They want you to draw the inference that we couldn't have received this. Because if we would have received this, we would have provided a defense. We will tell the jury that's an unreasonable inference. You can, from their own testimony, from the way they handled Avondale, the other cases, they had a policy of not defending these cases. And the claim that they would not have understood- They get this package. They wouldn't have understood the significance of the 1983 PRP letter. It's in the record that 1,100 of those letters went out. Travelers established a committee, a division inside their company to deal with those letters. This was a significant exposure to them. Because many of those 1,100 policyholders, or recipients of the letters, many were travelers, policyholders. They knew the significance of this letter. And the significance of the letter was clear from its face. And in fact, if you look at the proceedings over the last 30 years, they've played out exactly the way the letter suggests that it will. As to Century, would you agree that you did not provide, your client did not provide all reasonably available information? No, and that's not a ground. They have never denied coverage for that. That's been raised for the first time on an appeal. And what we would say is that if they needed more information, what typically happens is they come back and ask for additional information. To impose a burden on the outset, we're not aware of any case that has done that. But on that point, can I move to the notice of occurrence as to Century? And this is a critical point. The issue- Transmittal of the 1983. Well, no, I was going to address whether or not notice should have been given as to occurrence for Century prior to 1983. There is substantial evidence, and the view was shared by travelers, by the regulators that Hooker was responsible. But let me lay out first what I think is the legal question. The question is, at what point was it reasonable to believe that Grumman would incur liability that dated back to the 50s and 60s? There's no issue as to notice of occurrence as to travelers. The current insurer, because Grumman notified travelers in 1976, travelers was there, travelers investigated the site. Travelers agreed that the contamination was most likely coming from Hooker. And this is important because it's the 70s. I'm not sure they agree with that, but tell us what your argument is with respect to Century. Right, that in the 70s, this was pre-CIRCLA. If there was going to be liability, it was going to be imposed under tort law. It would be imposed as nuisance, trespass. There it is critical who was the polluter, right? There is no retroactive, strict liability under CIRCLA. What's your point as to why you didn't have to notify them? Because there wasn't a reasonable belief that Grumman would incur liability for any practices that happened in the 50s and 60s. If someone brought a tort suit, which we did not have any reason to expect they did, that would have triggered traveler's policies, that would have related to our current insurers. It's like if tomorrow I got in a car accident, I would call up my insurer and inform them. I wouldn't call up my insurer from ten years ago, unless until I had some reason to think that the accident was something that happened ten years ago. The then existing legal framework, you're saying, I take it, your client had every reason to believe that Hooker was on the hook. Was on the hook for the 50s and 60s. Not Grumman. If you thought you could have been sued in tort, why wouldn't that have triggered an obligation? Well, we had a reason belief that we couldn't have, because we thought it was Hooker. But even if you had concluded that we could have, our position is that it would have been reasonable to think it would have only implicated the policies of our current insurer, not policies dating back two decades earlier. All right, let's move forward to your notice to them in the copy that you sent of the 1983 communication. Century argues that you didn't allude to their policy, and that seems to be a requirement of the policy. How is that notice satisfactory then? We don't read New York law, and they haven't cited a case saying that you have to list, provide the policies, and list the policies, and identify them. And in fact, there are cases in which a policy holder has received coverage when the policies were never located. I'm looking at a decision by the New York Court of Appeals called Sabara Construction versus AIU Insurance Company in which the court states that notice provided under a workman's compensation policy at the time of the incident did not constitute notice under the liability policy. Even though both policies were written by the same carrier, each policy imposes separate contractual duties to provide notice. That would seem to support Century's argument that they are entitled to distinct notice, not just a carbon copy of a letter that you sent to travelers. But they got the letter, and they got the package. But it doesn't refer to their policy. It's putting them on notice that you've told travelers that they've got them, that they're liable under their policy. But the evidence shows that this was a common way to notice claims at the time. New York says that if you allude to one policy, even from the same carrier, it doesn't provide notice that you're seeking under another policy. I don't know how a letter that refers only to traveler's policy puts Century on notice that you're now invoking their policy. Because we sent it to them, and there's no allegation that there was different types. You didn't send notice to them, you sent them a copy of your notice to travelers. But our obligation was to forward the claim. We did not need a cover letter. Doesn't the policy say that you have to allude to the policy? No. I think so, okay. I'll take the- Okay, we take the position that forwarding the claim was sufficient. Thank you. Thank you. All right, thank you all of you very much. We'll take the matter under advisement. Our last case today is on submission, so we stand adjourned. All standing adjourned.